HENRY P. LEWELING, Plaintiff-Appellant, v. SCHNADIG CORPORATION, Defendant-Appellee.

First District (5th Division)   No. 1—94—1904

Opinion filed November 9, 1995.

GORDON, J., specially concurring.

Gregory A. Stayart, of Chicago, for appellant.

Vedder, Price, Kaufman & Kammholz, of Chicago (Bruce R. Alper, of counsel), for appellee.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

On November 10, 1993, the plaintiff, Henry P. Leweling, filed a complaint against the defendant, Schnadig Corporation (Schnadig), for retaliatory discharge. In his complaint, plaintiff alleged that defendant terminated his employment because he insisted that defendant comply with an Interstate Commerce Commission (ICC) regulation that requires motor contract carriers to enter into written contracts with shippers.

On December 16, 1993, defendant filed a motion to dismiss under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)). On March 3, 1994, the trial court granted defendant's motion to dismiss.

On appeal, plaintiff contends the trial court erred in dismissing his complaint for retaliatory discharge since he was fired for exercising legal rights protected by a clearly mandated public policy of Illinois.

### BACKGROUND

Defendant is a Delaware corporation, with its principal place of business in Chicago, Illinois. It is engaged in the nationwide manufacture, distribution and sale of furniture. Defendant, in connection with the sale and distribution of furniture throughout the United States, regularly uses the services of motor carriers. Defendant hired plaintiff in August 1989 on an "at-will" basis, as director of traffic and distribution. Plaintiff's duties included, but were not limited to, selecting motor carriers used by defendant, monitoring their performance, monitoring their freight charges, and reviewing the arrangements by which they served defendant.

During his employment with defendant, plaintiff observed that defendant did not execute written, bilateral contracts with the interstate contract carriers, but instead was operating on the basis of oral agreements. Therefore, plaintiff advised defendant that Federal regulations, issued by the Interstate Commerce Commission, mandated the execution of written, bilateral contracts when using interstate for-hire contract carriers. Plaintiff also advised defendant that if defendant used an interstate contract carrier without a written, bilateral contract, only the tariff rates filed with the ICC were the lawful rates that such carrier could charge defendant for transportation service, and not any rates based on an oral agreement.

Plaintiff prepared drafts of written, bilateral contracts for execution by defendant in connection with its use of interstate contract carriers and circulated the draft contracts for review and adoption by defendant's personnel, including plaintiff's supervisors. However, defendant informed plaintiff that it would neither agree to the execution of written, bilateral contracts with any of its for-hire interstate contract carriers, nor rely on any published tariff charges in paying for motor carrier services. Defendant fired plaintiff on the same day, without written notification of his discharge or any written explanation.

On November 10, 1993, plaintiff filed a complaint against defendant for retaliatory discharge. In the complaint, he alleged that the defendant discharged him in retaliation for plaintiff's insistence that defendant not violate Federal laws and regulations in the use of interstate motor carriers. Plaintiff further alleged that his termination violated the clear and strong policy of the United States in regulating for-hire motor carrier transportation as issued by the ICC.

On December 19, 1993, defendant filed a motion to dismiss, stating that plaintiff failed to state a claim for retaliatory discharge because the Federal Interstate Commerce Act (the Act) (49 U.S.C. § 10101(a)(8) (1988)) does not reflect a clearly mandated public policy of the State of Illinois. Defendant also contended the statutory provision on which plaintiff relies does not apply to defendant because the provision regulates the conduct of carriers, not shippers, such as defendant. On March 3, 1994, the trial court granted defendant's motion to dismiss, stating that the acts alleged in the complaint were not sufficiently serious violations to give rise to the tort of retaliatory discharge.

We affirm.

OPINION

In considering a motion to dismiss, a reviewing court must accept as true all well-pleaded facts alleged in the complaint and all reasonable inferences that can be drawn from those facts. (*Wieseman v. Kienstra, Inc.* (1992), 237 Ill. App. 3d 721, 722, 604 N.E.2d 1126; *Eisenbach v. Esformes* (1991), 221 Ill. App. 3d 440, 442, 582 N.E.2d 196; *Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495, 499, 568 N.E.2d 870.) The granting of a motion to dismiss is within the trial court's sound discretion and will not be reversed unless that discretion is abused. *Eisenbach*, 221 Ill. App. 3d at 442.

■ Retaliatory discharge is an exception to the general rule that "at-will" employment is terminable at any time for any or no cause. (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 128, 421 N.E.2d 876.) The purpose of retaliatory discharge is to balance the employer's business in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out. *Palmateer*, 85 Ill. 2d at 129.

To establish a valid claim for retaliatory discharge, an employee must show that he was (1) discharged; (2) in retaliation for his activities; and (3) that the discharge violated a clear mandate of public policy. (*Hartlein v. Illinois Power Co.* (1992), 151 Ill. 2d 142, 160, 601 N.E.2d 720; *Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill. 2d 526, 529, 519 N.E.2d 909.) Leweling contends the trial court erred in concluding that his claim failed to establish the third element.

■ There is no clear-cut definition of public policy. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. (*Palmateer*, 85 Ill. 2d at 130.) The Illinois Supreme Court has held that public policy can also be found in Federal laws that are national in scope and affect citizens collectively. See *Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 485 N.E.2d 372 (Federal regulations found in the Atomic Energy Act of 1954 (42 U.S.C. § 2011 *et seq.* (1958)) stated a clear mandate of public policy to protect citizens from the hazards of radioactive materials); *Sherman v. Kraft General Foods, Inc.* (1995), 272 Ill. App. 3d 833, 651 N.E.2d 708 (provisions found in the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 *et seq.* (1970)) furthered the public policy of protecting the lives and property of the citizens of the State); *Howard v. Zack Co.* (1994), 264 Ill. App. 3d 1012, 637 N.E.2d 1183 (public policy favors the reporting of a good-faith belief that records relating to the construction of nuclear power plants are being falsified, tampered with, misplaced, and/or generally maintained under conditions violative of Federal regula-

tions); *Russ v. Pension Consultants Co.* (1989), 182 Ill. App. 3d 769, 538 N.E.2d 693 (Federal laws requiring payment of Federal income taxes foster a clearly mandated public policy because underpayment of Federal income taxes could result in underpayment of State taxes); *Balla v. Gambro, Inc.* (1990), 203 Ill. App. 3d 57, 560 N.E.2d 1043 (where the court held plaintiff's opposition to the redistribution of misbranded and adulterated kidney dialyzers advanced the clearly mandated public policy of protecting the lives of citizens); *Johnson v. World Color Press, Inc.* (1986), 147 Ill. App. 3d 746, 498 N.E.2d 575 (where the court held that reporting improper accounting procedures that violated Federal security laws promoted the public policy of full disclosure, truthfulness and accuracy in financial reports to the government and to the public).

However, merely stating a constitutional or statutory provision is not enough. The policy identified in the complaint must either "strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed" (*Palmateer*, 85 Ill. 2d at 130), or involve the protection of each citizen's health and safety. (*Wheeler*, 108 Ill. 2d at 511.) Illinois courts have consistently held that policies affecting the health and safety of citizens will support a retaliatory discharge claim. For example, in *Palmateer*, plaintiff's employer discharged him because he agreed to supply information regarding a co-employee's possible criminal violations to local law enforcement authorities. The court held that there is a clear public policy favoring investigation and prosecution of criminal offenses. (*Palmateer*, 85 Ill. 2d at 132.) Most recently, in *Sherman v. Kraft General Foods, Inc.* (1995), 272 Ill. App. 3d 833, 651 N.E.2d 708, the plaintiff was discharged because he reported asbestos hazards to his employer. The court held that the plaintiff's discharge violated the public policy of protecting the lives and property of the citizens of Illinois. *Sherman*, 272 Ill. App. 3d at 838.

On the other hand, public policies associated with social and economic regulation are less likely to be held sufficient to support a claim for retaliatory discharge. (*Fowler v. Great American Insurance Cos.* (N.D. Ill. 1987), 653 F. Supp. 692, 697.) In *Fowler*, the plaintiff claimed he was discharged for complying with the Illinois Insurance Code (215 ILCS 5/1 et seq. (West 1992)). However, the court held that the public policy underlying the Insurance Code is designed to achieve economic security and to encourage greater social responsibility. The court concluded this policy was not directly related to public safety. *Fowler*, 653 F. Supp. at 697.

Similarly, in *Hicks v. Resolution Trust Corp.* (7th Cir. 1992), 970 F.2d 378, the seventh circuit rejected a bank manager's claim of re-

taliatory discharge when he informed Federal banking officials of his employer's deficiencies under the Community Reinvestment Act (the Act) (12 U.S.C. § 2901 *et seq.* 1982)). The court noted that the Act's purpose, which was to ensure that banks provide investment and credit opportunities for their local communities, expressed a public policy affecting many people. However, the court held the public policy did not implicate a citizen's rights, duties or health. *Hicks*, 970 F.2d at 382.

A recent seventh circuit case is strongly dispositive of this case. In *Long v. Commercial Carriers, Inc.* (7th Cir. 1995), 57 F.3d 592, the plaintiff alleged he was fired for refusing to sign a lease agreement with his employer because it violated ICC regulations. The court held the violations did not rise to the level required for a retaliatory discharge because they did not involve issues of the health or safety of the general public; instead, they involved the allocation of expenses, responsibility for permits and insurance payments, and compensation for drivers. The court stated that a claim for retaliatory discharge could rest on a Federal violation, "but only if those regulations involved the health or safety of individuals, or other interests deemed crucial to public policy." *Long*, 57 F.3d at 596.

Plaintiff claims his discharge violated the underlying public policy of the Interstate Commerce Act, which is to "ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States *** and national defense." (49 U.S.C. § 10101(a) (1988).) This public policy is exemplified by the statutory purposes set out in 49 U.S.C. § 10101(a)(1) (1988):

"(A) to recognize and preserve the inherent advantage of each mode of transportation;

(B) to promote safe, adequate and economical, and efficient transportation;

(C) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(D) to encourage the establishment and maintenance of reasonable rates for transportation, without unreasonable discrimination or unfair or destructive competitive practices;

(E) to cooperate with each State and the officials of each State on transportation matters; and

(F) to encourage fair wages and working conditions in the transportation industry."

As plaintiff states, the Illinois General Assembly has adopted an almost identical public policy, with virtually identical goals, in the Illinois Commercial Transportation Law (625 ILCS 5/18c—1103 (West

1992)). The expressed public policy of the State of Illinois is to "actively supervise and regulate commercial transportation of *** property within this state." (625 ILCS 5/18c—1103 (West 1992).) The statutory purposes set out in the provision are also virtually identical to the statutory purposes of the Federal statute.

■ Defendant contends the Interstate Commerce Act is economic legislation serving primarily commercial interests. We agree. The Interstate Commerce Act is national in scope because it affects citizens collectively; however, it is clear the Act's purposes, as well as the purposes of the Commercial Transportation Law, are financial in nature, and the policies neither "strike at the heart of a citizen's rights, duties or responsibilities" nor advance health and safety. As in the *Long* case, the ICC regulations deal primarily with certain noncrucial financial and contractual interests that do not rise to a sufficient level for a retaliatory discharge claim. *Long*, 57 F.3d at 596.

Furthermore, on May 5, 1992, the Interstate Commerce Commission repealed the regulations governing mandatory contracts between carriers and shippers. The ICC stated that "the contract regulations *** have outlived their usefulness and are causing more harm than good." (*Contracts for Transportation of Property* (1992), 8 I.C.C.2d 520 (*ex parte* No. MC—198).) The ICC further stated that the original purpose of the regulation, which was to keep contract carriers in their place, was no longer a valid objective in light of deregulation, and the regulations have become an impediment to contract carriers and shippers who would benefit from the elimination of the contract rules. *Contracts for Transportation of Property* (1992), 8 I.C.C.2d 520 (*ex parte* No. MC—198).

■ It is the public policy in effect when the employee is discharged that counts. (See *McKay v. Pinkerton's, Inc.* (1992), 239 Ill. App. 3d 509, 607 N.E.2d 237.) Although the repeal occurred over one year after plaintiff's discharge, the rescission indicates that the regulation did not advance a significant public policy sufficient to support a retaliatory discharge claim. We note that Congress reinstated the written contract requirement in December 1993 to limit the potential for unwarranted future undercharge claims. (*Policy Statement On Motor Contract Requirements Under the Negotiated Rates Act of 1993* (1994), 10 I.C.C.2d 53 (*ex parte* No. MC—1989 (Sub—No. 1)).) However, this purpose still does not advance a public policy that either implicates the responsibilities, rights and duties of the citizens of Illinois or affects their safety and welfare.

Plaintiff also contends he acted as a "citizen crime fighter" in trying to prevent Schnadig from disregarding carrier tariff rates. Public policy favors the exposure of criminal activity, and the cooperation of

citizens possessing knowledge thereof is essential to effective implementation of that policy. (*Palmateer*, 85 Ill. 2d at 132.) In *Russ v. Pension Consultants Co.* (1989), 182 Ill. App. 3d 769, 538 N.E.2d 693, the plaintiff filed a retaliatory discharge claim because his employer fired him for refusing to create and backdate pension plans which would violate Federal tax laws. The court held Illinois has an interest in the enforcement of the Federal tax laws because falsification of Federal tax records could also mean the falsification of State tax records, since the legislature has adopted the Federal taxable income as the starting point for calculating the State corporate income tax. Therefore, the underpayment of Federal income taxes could result in the underpayment of State taxes. *Russ*, 182 Ill. App. 3d at 777.

Similarly, in *Johnson v. World Color Press, Inc.* (1986), 147 Ill. App. 3d 746, 498 N.E.2d 575, the plaintiff alleged he was discharged in retaliation for his opposition to certain accounting practices of his employer that he claimed constituted violations of Federal security laws. The court found that improper entries in the company's financial statements could mislead the public who are potential investors of the employer's parent company. Therefore, the court held that public policy favors full disclosure, truthfulness and accuracy in the financial reports made by businesses to the government and to the public, and that employees who voice objections to practices that they reasonably believe violate this policy should be protected from being discharged as a result of such objection. *Johnson*, 147 Ill. App. 3d at 754.

Schnadig contends that it did not commit a crime because the relevant provisions impose liability on shippers and common carriers which *knowingly* observe less than the tariff rate. However, we must take the facts as alleged in the complaint as true. In this case, Leweling alleges that Schnadig violated 49 C.F.R. §§ 1053.1(b), (c) (repealed by ICC in *Contracts for Transportation of Property* (1992), 8 I.C.C.2d 520), which stated that contracts between motor carriers shall be bilateral and in writing, and if there is not a valid contract, the parties must adhere to the published tariff rates.

However, not all criminal activity advances a public policy sufficient to warrant protection from a retaliatory discharge claim. Again, the policy must give rise to a social duty or responsibility, or promote the health and welfare of the citizenry. The public policies in *Russ* and *Johnson* protect citizens from fraudulent and misleading information that could ultimately affect their welfare, whereas the public policy advanced in the ICC provisions does not affect the overall welfare of citizens. The provisions only affect the relationship and

responsibilities of shippers and carriers. Therefore, we conclude that although plaintiff contends he acted as a "citizen crimefighter," such action in the instant case does not advance a public policy sufficient to warrant protection from a retaliatory discharge claim.

Also, another factor which courts consider in deciding a retaliatory discharge claim is the availability of an adequate alternative remedy. In *Fellhauer*, a city employee was discharged for opposing the mayor's politically motivated purchasing activities. Although the mayor's conduct violated State criminal laws, the court held the employee did not state a retaliatory discharge claim. The court held the employee had not demonstrated a sufficient public policy because a countervailing public policy favored mayoral discretion in making employment decisions for the city and because the official misconduct statute provided its own deterrent through criminal sanctions. *Fellhauer*, 142 Ill. 2d at 508-09; see also *Fowler v. Great American Insurance Cos.* (N.D. Ill. 1987), 653 F. Supp. 692, 698 (Insurance Code provides for license revocation of insurance company).

■ In this case, plaintiff has cited provisions of the statute that impose a fine of "at least $1,000, but not more than $20,000, imprison-[ment] for not more than two years, or both" on a shipper as well as any employee who fails to observe the public tariff charges of motor carriers. (49 U.S.C. §§ 11903(b), (c) (1988).) Therefore, plaintiff asserts that he could face prosecution for Schnadig's refusal to observe the tariff rates. However, we believe the strong deterrents contained in the statute provide for an adequate and available remedy.

For the reasons cited herein, we hold that plaintiff failed to state a cause of action for retaliatory discharge. Therefore, the order of the circuit court granting defendant's motion to dismiss is affirmed.

Affirmed.

McNULTY, J., concurs.

JUSTICE GORDON, specially concurring:

While I agree on balance with the conclusion of the majority, I have difficulty with the suggestion that where a sufficient deterrent exists to inhibit an employer from committing a given illegal act, there is no need to extend the retaliatory discharge remedy to protect an employee who is discharged for exposing that illegal act. Under that approach, assuming an overall positive correlation between the severity of punishment and the nature of the misconduct, there would be an inverse correlation between the gravity of an employer's illegal conduct and the retaliatory discharge protection which would be af-

forded to an employee who is discharged for exposing it or for refusing to participate in it. Such a result would be ironic as well as unrealistic. It would mean that an employee's exposure, for example, of an act of murder by his employer or of narcotics trading would go unprotected since the criminal penalties for such offenses are uniformally severe and that only exposure of minor misdemeanors would then qualify.

While there is language in the supreme court opinion of *Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495, 568 N.E.2d 870, which appears to support that conclusion, I do not believe it is intended to reach beyond the factual context of that case. There our supreme court refused to recognize a claim by a discharged city employee, Fellhauer, for retaliatory discharge when he was fired by the mayor of Geneva, Illinois, for interfering with the mayor's negotiations with certain electric power suppliers. Fellhauer argued that he was discharged, among other things, for refusing to cooperate with the mayor's solicitation of campaign contributions from city vendors. The court concluded that in the face of a countervailing legislative policy which gives the mayor a right to remove any of his appointees (see Ill. Rev. Stat. 1987, ch. 24, par. 3—11—1), the tort of retaliatory discharge should be restricted to protect employees who expose or interfere with illegal conduct of their employer where such conduct is not otherwise sufficiently deterred through other sanctions. I also note that in *Fellhauer* the court did not agree that plaintiff sufficiently alleged official misconduct on the part of the mayor in the first place.

Ultimately, however, even in *Fellhauer*, the court recognized that although deprived of the remedy of retaliatory discharge, the employee under legislative mandate still had recourse to a legislative remedy insofar as he could be restored to the position from which he was removed by a two-thirds vote of the city council. See *Fellhauer*, stating:

> "The requirement that a meeting be convened shortly after the dismissal, and the power of two-thirds of the members of the city council to restore the officer to the position from which he was removed, protect the officer's interest in securing a livelihood and provide an appropriate forum in which to resolve the merits of the dismissal." *Fellhauer*, 142 Ill. 2d at 509.

Here, where we do not confront a countervailing statutory policy concerning the right of an elected official to remove his appointees and where no alternative remedy for the employee is available, the existence of independent sanctions to inhibit the employer from violating the ICC regulation should not be dispositive of the employee's right to claim retaliatory discharge.

The case of *Fowler v. Great American Insurance Cos.* (N.D. Ill. 1987), 653 F. Supp. 692, to which the majority also refers does not, in my view, focus upon this issue. There, Fowler, a marketing supervisor, was ordered by his employer not to accept new insurance business from a number of its agencies which the employer had targeted to be closed down. Instead of his compliance, Fowler wrote letters to these agencies informing them that new business would be accepted from them. When terminated, Fowler sued his employer, claiming that he was fired for implementing a policy promoted by the Insurance Code to avoid the dissolution of insurance agencies by requiring the insurance carrier to attempt to work out a rehabilitation program with them. The court first rejected the notion that the rehabilitation policy which Fowler purported to implement was a public policy within the ambit of protection offered by the tort of retaliatory discharge. (See *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124.) The court then further stated that even if protected, the plaintiff's activities did not warrant such protection since it was unnecessary for that plaintiff to thwart his employer's instructions by actually transacting new insurance business with those agencies targeted for termination. It would have been quite sufficient for him to simply report his employer's instructions to the Department of Insurance. Thus, the court in *Fowler* concluded, contravention by the plaintiff of his employer's orders was unnecessary and therefore did not warrant protection. By the same token, the court in *Fowler* does not suggest that had Fowler been discharged for reporting the employer's instructions to the Department of Insurance, he would have been barred from tort recovery for retaliatory discharge by reason of any direct sanctions which could have been entered against the employer by the Department of Insurance for its substantive policy violations. I therefore do not find any resonance in *Fowler* of the proposition that the availability of a retaliatory discharge remedy should be restricted where the employer's illegal conduct which the employee sought to expose is otherwise sufficiently deterred.

I'm also not fully aligned with the majority in holding that where an employee is discharged for exposing his employer's illegal conduct to the proper policing authority, his discharge will not trigger a retaliatory discharge action unless the illegal conduct which he exposed is, itself, violative of a public policy. While the holding in *Fellhauer v. City of Geneva* does tilt in that direction, it would represent a substantial modification of the original position of our supreme court in *Palmateer v. International Harvester*. In *Palmateer* the supreme court appeared to suggest that the right to cooperate with the police in their investigation is in and of itself a protected public

policy regardless of the nature or gravity of the underlying crime which was under investigation. See *Fowler v. Great American Insurance Cos.*, 653 F. Supp. 692.

However, in this case, unlike *Palmateer*, we need not confront that issue. Here, plaintiff did not allege that he was fired for whistleblowing or for cooperating with a police investigation as in *Palmateer*. Rather, the complaint alleges that plaintiff advised and admonished his employer about compliance with ICC regulations and went further by preparing drafts of written contracts which he circulated among his employer's personnel and supervisors for use in contracting with his employer's interstate carriers. Thus here, unlike *Palmateer*, the plaintiff did not allege that he reported the alleged illegal activities of his employer to a government enforcement agency. Instead he alleged that he attempted, by himself, without his employer's authorization, to internally override his employer's business practices, albeit for the purpose of bringing about his employer's compliance with ICC regulations. The facts here are therefore more analogous to *Fowler* rather than to *Palmateer* and would, therefore, not suffice to invoke the public policy which may well arise under *Palmateer* to protect an employee who "blows the whistle" or otherwise cooperates with a police investigation of any criminal activity.

Accordingly, subject to the foregoing qualms and qualifications, I concur with the conclusion of the majority.